IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | No. 2:18-cv-0780-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| QUENTIN JOHN FISHBURNE and | ) | |
| RENATA SHONTEL ELLISON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The following matter is before the court on defendant Quentin John Fishburne's ("Fishburne") motion to suppress, ECF No. 136. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND

The government jointly indicted Fishburne and Renata Shontel Ellison ("Ellison") for several offenses related to the alleged straw purchase of firearms and transfer of those firearms from Ellison, the purchaser, to Fishburne, who has previously been convicted of a felony, and others. Specifically, the indictment charges five counts against the defendants: Counts 1 and 5 charge Fishburne with knowingly possessing firearms after having been convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e); Count 2 charges both Fishburne and Ellison with conspiracy to transport firearms to persons who have previously been convicted of felonies in violation of 18 U.S.C. § 922(d)(1); Count 3 charges both Fishburne and Ellison with knowingly making false statements in connection with the conspiracy to unlawfully obtain and sell firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2); and Count 4 charges Ellison with

1

knowingly transferring a firearm to Fishburne, who had previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(d) and 924(a)(2).

On March 31, 2018, Fishburne, travelling down Hires Corner Road in Walterboro, South Carolina, came to stop at traffic safety checkpoint. Police arrested Fishburne after a search of his vehicle revealed a .40 caliber Smith & Wesson M&P Shield pistol (the "S&W .40") under the vehicle's front seat. This initial arrest gave rise to the current action against Fishburne and Ellison. Further, the S&W .40 forms the basis for Fishburne's Count 1 charge for felony possession of a firearm. This motion to suppress challenges the legally of the initial stop of Fishburne's vehicle pursuant to the traffic safety checkpoint.

Many of the facts surrounding the stop of Fishburne's vehicle are in dispute. The following facts, however, are not. On March 31, 2018, police officers Brandon A. Duboise ("Duboise"), Robert Cook ("Cook"), and Riley[1] operated a checkpoint near the intersection of Hiers Corner Road and Center Street in Walterboro, South Carolina. Around 3:15 in the afternoon, Fishburne, travelling down Hiers Corner Road, stopped his vehicle at the traffic checkpoint and encountered Duboise. Duboise motioned for Fishburne to roll down the window, and when Fishburne partially rolled his window down in response, Duboise asked for Fishburne's license and registration. At that point, Duboise claims to have smelled the odor of marijuana emanating from Fishburne's vehicle. Duboise then directed Fishburne to pull his vehicle to a grassy area beside Center Street, approximately 100 feet from the initial stop, so that it could be searched. After Fishburne pulled over, Cook and Riley approached Fishburne's vehicle to assist

---

[1] Officer Riley's first name does not appear in the record.

Duboise in the search. Fishburne exited the vehicle, and Duboise patted Fishburne down but did not find any contraband on his person. Duboise and Cook proceeded to search Fishburne's vehicle. During the search, Duboise asked Cook if he could smell marijuana, to which Cook responded "faintly." Duboise then found the S&W .40 under the front passenger seat of the vehicle, and the officers arrested Fishburne. Body camera video from Cook's body camera captured a significant portion of the interaction between Fishburne and the police officers. However, Duboise did not activate his body camera during the interaction, so no footage is available until Cook arrived on the scene.

On February 5, 2020, Fishburne filed a motion to suppress. ECF No. 136. On February 10, 2020, Fishburne amended his motion to suppress. ECF No. 140. The same day, the government filed a response. ECF No. 141. A hearing on the suppression motion was held on February 12, 2020, where the court received evidence relevant to the checkpoint seizure of Fishburne. The court has considered the evidence, and the motion to suppress is now ripe for the court's review.

## II. DISCUSSION

Fishburne argues that his initial stop pursuant to the police checkpoint violated his Fourth Amendment right against unreasonable searches and seizures, such that the S&W .40 discovered in his vehicle should be excluded as the fruit of an unconstitutional seizure.[2] According to Fishburne, "the stop was made on the discretion of Officer

---

[2] Fishburne's motion challenges the constitutionality of the initial stop of Fishburne's vehicle pursuant to the police checkpoint; Fishburne does not independently challenge the constitutionality of the police ordering Fishburne to the side of the road, nor does he challenge the subsequent search of the vehicle. Therefore, the court only analyzes the constitutionality of the searches and seizures that occurred after the initial stop of Fishburne's vehicle to the extent that they are tainted by the unconstitutionality of the initial checkpoint stop.

Duboise [without reasonable suspicion] under the guise of a traffic checkpoint." ECF No. 140 at 2. In response, the government contends that the checkpoint passes constitutional muster because it was minimally intrusive, operated in substantial compliance with the Walterboro Police Department's ("WPD") checkpoint policies, and supported by the legitimate primary purpose of traffic safety. Based on the evidence received at the suppression hearing, the court finds that the police checkpoint was a reasonable intrusion into the privacy interests of motorists and thus constitutional.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." City of Indianapolis v. Edmond, 531 U.S. 32, 41 (2000). Generally, a seizure is reasonable only if based on probable cause, Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001) (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979)), or, depending on the seizure's purpose and brevity, reasonable suspicion, see Terry v. Ohio, 392 U.S. 1, 28–29 (1968).

However, the Supreme Court has upheld seizures of persons pursuant to police checkpoints even where the stops were not supported by any degree of individualized suspicion. See Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990) (checkpoint for the purpose of removing drunk drivers from the road); United States v. Martinez—Fuerte, 428 U.S. 543 (1976) (border patrol checkpoint designed to intercept unlawfully entering foreigners); see also Delaware v. Prouse, 440 U.S. 648 (1979) (suggesting in dicta that a checkpoint with the purpose of verifying drivers' licenses and vehicle registrations would be permissible). Courts must determine the constitutionality of a

suspicion-less, traffic-stop seizure "by balancing its intrusion on the individual's Fourth Amendment interests against [the checkpoint's] promotion of legitimate governmental interests." Prouse, 440 U.S. 648 at 654–655.

The Fourth Circuit has outlined the procedure for determining the constitutionality of a police checkpoint:

> In determining the constitutionality of a checkpoint, the court must inquire into both the primary purpose and the reasonableness of the checkpoint. If the primary purpose of the checkpoint was to advance "the general interest in crime control," it is per se invalid under the Fourth Amendment. If the primary purpose was valid, the court must then judge the checkpoint's reasonableness on the basis of individual circumstances. This requires balancing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Factors to weigh intrusiveness include whether the checkpoint: (1) is clearly visible; (2) is part of some systematic procedure that strictly limits the discretionary authority of police officers; and (3) detains drivers no longer than is reasonably necessary to accomplish the purpose of checking a license and registration, unless other facts come to light creating a reasonable suspicion of criminal activity.

United States v. Henson, 351 F. App'x 818, 820–21 (4th Cir. 2009) (internal citations omitted). Thus, the court must first analyze the legitimacy of the primary purpose for the police checkpoint at issue. Then, if the court finds that purpose legitimate, it must employ the intrusiveness factors to balance that legitimate purpose against the checkpoint's interference with individual liberty.

The government contends that the checkpoint in this case served the legitimate purpose of traffic safety. The checkpoint was located on Hiers Corner Road. Forrest Hills Elementary School is located on one side of Hiers Corner Road, and a preschool is located on the other. The government contends that safety is a concern on Hiers Corner Road because the road "is often used as a cut-through between Highway 15 and Highway 64, and WPD had received a lot of complaints from residents of the neighborhood about

drivers speeding in the area." ECF No. 141 at 5.  At the hearing, Cook testified to the primary purpose of the checkpoint:

> Q. Can you tell us what -- what led you guys to do your traffic checkpoint in this particular place?
>
> A. Yes, sir. If you look on the map, you see a Forest Hills Preschool, and directly across that is a Forest Hills Elementary School. We were getting complaints from the residents as well as the parents whose children went to the school about speeders in the area.

ECF No. 144, Tr. 6:7–13. Additionally, Corporal Albert Sweat[3] ("Sweat"), who gave verbal authorization for the checkpoint, testified that to the primary purpose of the checkpoint and that the WPD had received complaints of speeding from concerned citizens in the area.

> Q. Now, Corporal Sweat, do you remember a traffic checkpoint that was set up around March 31st, 2018, on Hiers Corner?
>
> A. Yes, ma'am.
>
> Q. And did you provide approval for that checkpoint?
>
> A. Yes, ma'am.
>
> Q. How was that approval given?
>
> A. Sergeant Cook came to me and inquired about setting up a checkpoint on the location of Hiers Corner and Center Street. Any time a checkpoint is asked to be conducted, I check the records to see what kind of traffic volume and traffic complaints we have in that area to see if it's -- deems a traffic checkpoint necessary. I checked my records through complaints of the neighborhood. Forest Hills has their own Facebook page that constantly complains about traffic and police visibility, so I approved the checkpoint for that area.

---

[3] Sweat is now a corporal with the Jasper County Police Department. At the time of the events in question, however, he was a captain with the WPD.

Id. at 63:23–64:12.  Further, Officer Cook testified that the WPD has set up similar checkpoints along Hiers Corner Road in the past to deter unsafe driving.  Id. at 53:11–13 ("And had you run checkpoints in this particular neighborhood before?  A.  Yes, sir, we have.").

The Fourth Circuit has found that a checkpoint's primary purpose "to promote traffic safety by allowing police to check drivers' licenses and vehicle registration" is legitimate.  Henson, 351 F. App'x at 821; see also Prouse, 440 U.S. at 658–659 (stating in dicta that a checkpoint with the purpose of verifying drivers' licenses and vehicle registrations would be permissible).  Therefore, in light of the evidence of traffic safety concerns on Hiers Corner Road, which were heightened by the presence of nearby schools, the court finds that the checkpoint's primary purpose of traffic safety is a legitimate purpose.

Further, the intrusiveness factors weight in favor of the checkpoint's constitutionality.  As to the first factor—the visibility of the checkpoint—Fishburne contends that the traffic stop was not visible:  "The checkpoint was located at the end of a curve[,] making it impossible for an oncoming motorist to have a safe visual warning of its presence."  ECF No 140 at 6.  Further, Fishburne notes that "there is no supporting documentation that a warning sign was erected in the distance dictated by the WPD policy."  Id.  In support of his contention, Fishburne presented photographs at the hearing depicting a curve on Hiers Corner Road, which the was between 400 and 500 feet away from the intersection of Hiers Corner Road and Center Street, where the checkpoint was located.

In response, the government presented testimony from the officers that the checkpoint was marked with signs along Hiers Corner Road, that officers at the checkpoint wore reflective vests, and that police vehicles were parked at the checkpoint with blue lights illuminated. The government produced a picture of the sign that Duboise testified he used to mark the checkpoint. Gov. Ex. 8. Finally, the government presented photographs and elicited testimony from Duboise that the checkpoint could be seen from over 500 feet away.[4]

> Q. What's Government's Exhibit 6?
>
> A. This is actually me walking down. This is at 500 feet from the patrol car. I turned around, and you can plainly see where the patrol car is at 500 feet.
>
> Q. Where did you park your car?
>
> A. It's parked right on Center Street.
>
> . . .
>
> Q. So based on your measurement, you can see the intersection of Center Street from 500 feet down Hiers Corner; is that correct?
>
> A. Yes, sir.

ECF No. 145, Tr. 79:23–80:12. Based on the evidence, the court finds that the checkpoint was sufficiently visible to alert oncoming motorists, which weighs in favor of the checkpoint's constitutionality.

The second factor—whether the checkpoint was part of some systematic procedure that strictly limited the discretionary authority of police officers—also favors the government. The parties agree that WPD has a policy for traffic safety checkpoints.

---

[4] The court notes that a vehicle traveling 30 miles-an-hour, the speed limit on Hiers Corner Road, would arrive at the checkpoint more than eleven seconds after it became visible from 500 feet away.

The government has presented the policy. See ECF No. 141-1. The parties disagree, however, as to whether the officers adhered to that policy during their operation of the checkpoint. Based on the evidence presented at the suppression hearing, the court finds that the checkpoint was operated in substantial compliance with the WPD's policies, especially with respect to the aspects of the policy that limited the officers' discretionary authority.

Before the court delves into the substance of the policy provisions at issue, it wishes to clarify a point of law. The second factor of the intrusiveness test is whether the checkpoint "is part of some systematic procedure that strictly limits the discretionary authority of police officers." Henson, 351 F. App'x at 820–21 (citing United States v. McFayden, 865 F.2d 1306, 1312 (D.C. Cir. 1989)). While courts consider whether the police officers operating the checkpoint complied with a systematic procedure governing the checkpoint, that compliance with checkpoint policy is only legally significant to the extent that the policy "limit[s] the discretionary authority of police officers." In other words, evidence that a police officer violated a checkpoint policy in a way that has no bearing on his discretionary authority to invade privacy rights has little significance in determining whether the checkpoint was minimally intrusive. Evidence that an officer may have violated his police department's policy in operating a checkpoint does not render the checkpoint unconstitutional. The court will consider policy violations to the extent that they affect the operating officer's discretionary authority. Benign violations of checkpoint policy, however, have little constitutional significance. In short, the WPD does not determine the standards for a police checkpoint's constitutionality; the Supreme Court does.

The parties dispute whether officers complied with two provisions of WPD policy. First, the WPD traffic checkpoint policy states: "The location [of the checkpoint] must allow the checkpoint to be seen by approaching motorists at a minimum of 500 feet in each direction. It must not be set up in a curve." ECF No. 141-1 at 2. Second, the WPD body worn camera ("BWC") policy states: "BWCs must be worn and activated by officers at a call for service or initiates [sic] any other law enforcement or investigative encounter between and [sic] officer and member of the public, including but not limited to: . . . (b) Traffic Stops . . . (d) Suspicious persons . . . ." ECF No. 143-2 at 2.

As to the first policy provision, the court has already discussed the evidence both parties presented with respect to the checkpoint's visibility: Fishburne presented a photograph which he represented was taken from a distance of between 400 and 500 feet in which the intersection where the checkpoint was located was not visible. However, as the government pointed out, the picture indicated that the camera was angled away from the intersection, making visibility impossible. More compelling were the photographs presented by the government, which the government represented were taken more than 500 feet away from the intersection and in which a police cruiser at the intersection of Hiers Corner and Center Street was visible. Moreover, even if the checkpoint did violate this provision of the policy, such a violation speaks more to the visibility of the checkpoint than to the officers' compliance with a policy that "limit[s] the[ir] discretionary authority."

Fishburne also pointed out that officer Duboise violated WPD's BWC policy when he failed to activate his camera during his interaction with Fishburne. As Fishburne correctly points out, the WPD BWC policy required Duboise to activate his

body camera, because the interaction constituted a "traffic stop" and the smell of marijuana had rendered Fishburne a "suspicious person" with respect to the policy. Duboise testified that his failure to turn on his BWC was a mistake.

> Q. Do you know why you didn't turn your body camera on or don't have footage from that encounter with Mr. Fishburne when you're searching him?
>
> A. That particular day, I had my safety vest on which covers pretty much my whole -- everything I wear, so when I push the button, I can't visibly see if it's on or not, and like I said, I was worried about Mr. Fishburne, if there was anything in the car, safety reasons. I never did look down to confirm it was on.
>
> Q. Okay. So did you intend to put the body camera on?
>
> A. From what I recall, I'd mashed the button through the safety check -- the actual safety vest.
>
> Q. Okay. And you just don't know why it didn't turn on?
>
> A. I don't know why.

ECF No. 140, Tr. 84:2–15. The court finds that this likely mistake does not render the traffic checkpoint unconstitutional. Duboise's failure to activate his BWC after the initial stop of Fishburne has no bearing on whether the policies in place limited his discretionary authority to invade the privacy interests of individuals. Moreover, concerns about Duboise's credibility based on his failure to activate his BWC are mitigated by the fact that Cook's BWC captured the majority of the interaction. These violations of a WPD BWC policy do not convince the court that the traffic safety checkpoint was unconstitutional.

Additionally, the government presented evidence that the checkpoint was operated in substantial compliance with the WPD checkpoint policy. Officers testified that signs were erected on Hiers Corner Road to warn oncoming motorists of the

11

checkpoint, that the checkpoint was operated by three officers, and that the officers received authorization for the checkpoint from their superior, Sweat. Each of these acts followed WPD policy. Most importantly, the government presented evidence that the officers had no discretionary authority to select which vehicle to stop.

> Q. What was your protocol in determining which vehicles you stopped?
>
> A. Every vehicle.
> Q. Every single vehicle that came to the traffic checkpoint?
>
> A. Yes, sir.
>
> Q. And what was it that you did when a vehicle approached that traffic –
>
> A. We would ask for a driver's license, proof of insurance, and registration.

Id. at 11:18–12:1. Fishburne did not present any evidence which indicates that the officers had any discretion in making the checkpoint stops. Therefore, the second factor weighs in favor of the checkpoint's constitutionality.

As to the third factor—whether the stop detains drivers for no longer than necessary—the government contends that "except where other facts immediately gave them reasonable suspicion to extend the stop or probable cause to search, [the officers] detained drivers no longer than necessary to check licenses and registrations." ECF No. 140. Officers at the hearing testified that they stopped drivers long enough to check their driver's license, registration, and proof of insurance. Absent circumstances giving rise to probable cause, the officers then allowed drivers to continue. Fishburne did not dispute the length of time officers detained each stopped driver. Therefore, the third factor weighs in favor of constitutionality.

In sum, the court finds that the checkpoint had a legitimate primary purpose and was no more intrusive than necessary to serve that purpose. Thus, the checkpoint passes

constitutional muster, making the initial checkpoint seizure of Fishburne constitutional. Fishburne's motion to suppress is therefore denied.

### III. CONCLUSION

For the foregoing reasons, the court **DENIES** Fishburne's motion to suppress.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**February 24, 2020
Charleston, South Carolina**